UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                   :

UNITED STATES OF AMERICA,        :      S1 21 Cr. 296 (PAC)

                                   :

*-against-*                    :      **OPINION &**

PAUL FISHBEIN,              :      **PRELIMINARY ORDER**

                                   :

                   *Defendant.*      :
------------------------------------------------------------X

       After an eight-day trial and two days of deliberation, a jury convicted Paul Fishbein

("Fishbein") of mail and wire fraud, theft of government funds, aggravated identity theft, and

health care fraud arising out of schemes to receive (1) rental payments, (2) broker's fees, and (3)

Medicaid benefits. Fishbein's "rental payment scheme" is at issue now. Fishbein used two steps

to execute that scheme: first, he would wrongfully acquire title to properties; then, he would rent

the properties to individuals participating in New York City rental assistance programs while

holding himself out as the landlord to the Agencies[1] responsible for administering those programs.

As the "landlord," the City paid a rental subsidy directly to Fishbein to cover rent for tenants

participating in the programs. However, because Fishbein never owned the properties, he was not

entitled to rent them out or collect subsidies from the City. At trial, the Government illustrated

how Fishbein executed the rental payment scheme using three properties, and the jury found

Fishbein guilty based on that evidence. The Government now asserts that Fishbein executed that

same scheme by wrongfully obtaining title of fifteen additional properties and using the fraudulent

deeds of those properties to trick the Agencies. As such, the Government moves for $1,894,644.01

---

[1] Collectively, the "Agencies" are New York City's Human Resources Administration ("HRA"),
Housing Preservation & Development ("HPD"), and Housing Authority ("NYCHA").

in both forfeiture and restitution.  That amount covers the rental payments Fishbein received for all eighteen properties ($1,789,116.41), in addition to the broker's fee payments ($56,002.80) and Medicaid benefits ($49,524.80) that Fishbein wrongfully received from his other schemes.

Fishbein partially opposes the Government's motion and there are two issues before the Court.  First, the Court must determine whether Fishbein's receipt of rental subsidies for the additional properties constitutes additional executions of the same rental payment scheme proven at trial and are thus subject to forfeiture.  Second, the Court must determine whether a reduction in the amount Fishbein must pay in restitution is warranted to account for the "value" Fishbein provided to tenants who rented the apartments.

Having carefully reviewed the parties' written submissions, the underlying record, and the evidence and arguments presented during the post-trial proceedings, including closely reviewing each property's transfer paperwork and deed relevant to the Court's decision, the Court finds in the Government's favor on both issues.  First, the evidence supports that Fishbein knew or should have known that he did not actually own the additional properties but nevertheless sought rental subsidies from the Agencies in violation of the terms of the programs.  Second, the full amount of the payments must be returned to the Agencies in restitution because Fishbein improperly diverted government funds regardless of any "value" the tenants separately received.  Accordingly, the Court **GRANTS** the Government's motion and **PRELIMINARILY ORDERS** that Fishbein pay forfeiture and restitution in the full amounts requested with the final order to take effect at sentencing.

## BACKGROUND

### I.   Procedural History

In May 2021, Fishbein was charged in a four-count indictment.  Indictment, ECF No. 11.

On March 10, 2023, Fishbein was charged in a superseding indictment ("Superseding Indictment") on five counts: (1) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 ("Count One"); (2) mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 ("Count Two"); (3) theft of government funds, in violation of 18 U.S.C. §§ 641 and 2 ("Count Three"); (4) aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2 ("Count Four"); and (5) health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 ("Count Five"). Superseding Indictment, ECF No. 77. The Government provided notice that it planned to seek forfeiture for Counts One, Two, Three, and Five. *Id.* ¶¶ 6–7.

Fishbein proceeded to trial, which began on April 17, 2023, and ended on April 26, 2023. After deliberating for approximately a day and a half, the jury found Fishbein guilty on all five Counts. *See* Jury Verdict, ECF No. 120. This Court presided over the pre-trial proceedings and the entire trial.

On June 1, 2023, Fishbein renewed his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (which he made initially at the close of the Government's case-in-chief and the Court denied it, *see* Trial Tr.[2] at 684–88), and, in the alternative, moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. Fishbein argued that the evidence presented at trial was insufficient as a matter of law to support his convictions on Counts One through Four. He also argued that the Court erred in several ways, including by preventing Fishbein from making the "defense" that the Agencies "have gotten and are still getting exactly what they bargained for" because Fishbein rented properties to tenants through the Agencies' assistance programs. Def. Br. at 22, ECF No. 122.

---

[2] The transcript in this case is docketed at several ECF numbers. For convenience, the Court refers simply to the "Trial Transcript" regardless of the docket number of the excerpt referenced.

On August 8, 2023, this Court denied Fishbein's Rule 29 and Rule 33 motions. First, the evidence presented at trial was sufficient to sustain the mail and wire fraud and theft of government funds convictions because a rational jury could have concluded "that Fishbein knowingly misrepresented to the Agencies that he was the owner of the [p]roperties and that he did not believe himself in good faith to be the owner and landlord" and "that Fishbein requested and deposited brokers' fees payments, despite never using a broker in connection with renting out the" properties. *United States v. Fishbein*, No. S1 21 CR. 296 (PAC), 2023 WL 5035179, at *3, *5–6 (S.D.N.Y. Aug. 8, 2023). Second, the jury could have concluded that Fishbein committed aggravated identify theft because of the evidence that Fishbein used a broker's identity without her consent to receive broker's fees from the Agencies. *Id.* at *7. Finally, the Court rejected that it should have allowed Fishbein to present his "benefit of the bargain" defense because that defense applies in cases that involve misrepresentations made during a contract negotiation regarding, for example, the quality or price of goods sold. *Id.* at *8. That type of defense was simply unavailable here. "There was no negotiation—nor could there be—between the Agencies and Fishbein about whether someone falsely claiming to be a landlord or a broker could obtain payments from the Agencies nor did the Agencies have any discretion to continue paying someone who was not the lawful landlord or broker."[3] *Id.*

## II.    The Rental Payment Scheme Proven at Trial

At trial, the jury found Fishbein guilty of executing three schemes: the rental payment scheme, the broker's fee scheme, and the Medicaid fraud scheme. The Government now seeks

---

[3] A fuller analysis of the evidence supporting the jury's verdict on Counts One through Four and a rejection of Fishbein's arguments made in his Rule 29 and Rule 33 motions can be found in the Court's recent Opinion & Order. *See United States v. Fishbein*, No. S1 21 CR. 296 (PAC), 2023 WL 5035179, at *3–7, 8–10 (S.D.N.Y. Aug. 8, 2023).

forfeiture and restitution arising from each of them. Fishbein objects to a portion of the Government's request with respect to only the first scheme—the rental payment scheme.

The evidence at trial proved how Fishbein wrongfully obtained title to a property and then used that fake title to represent himself to the Agencies as the rightful owner in order to collect rental subsidy payments. The Government focused during trial on three properties (the "Trial Properties").[4] Fishbein held in his name a deed recorded with the City's Register for each of the Trial Properties. The Government's evidence demonstrated that beyond what the deed said superficially, Fishbein knew or should have known that the deeds were fraudulent.

First, the true owners of the Trial Properties testified and explained that they never conveyed ownership to Fishbein,[5] Trial Tr. at 216, 267–68, 398, and their signatures on the deeds purporting to convey the properties to Fishbein were forged, *id.* at 217, 270, 400–01. One owner testified that when he learned that there were new tenants renting his property, he contacted the person the tenants claimed to be paying rent to, someone they referred to as "Mr. Paul." *Id.* at 210–11. When the owner contacted this "Mr. Paul" and told him that the property was his and Mr. Paul had no right to rent it out, Mr. Paul told him that the "property now belongs to me, and if you come here again, you're going to be in big trouble." *Id.* at 211. Two owners also sued Fishbein seeking to strike Fishbein's "deeds" from the City's Register. *Id.* at 271, 275–76, 394–95. In one of those cases, a court entered default judgment against Fishbein and struck the deed—something

---

[4] The Trial Properties are located at 608 Van Buren Street and 551 Liberty Avenue in Brooklyn and 24-30 Beach Channel Drive in Queens.

[5] More specifically, for one of the Trial Properties, the owner's son testified. Trial Tr. at 260. The son explained that he attended the closing, helped his father collect rent from tenants of the property until they stopped paying, and could identify his father's social security number and signature. *Id.* at 260–62, 266.

Fishbein knew yet continued to represent himself as the landlord to the Agencies. *Id.* at 899–901; Gov. Ex. ("GX") 123.

Second, the deeds and related property transfer documents contained serious red flags. To file a deed on the City's Automated City Register Information System ("ACRIS"), the platform that "holds the documents that are recorded in the four boroughs" including deeds, an individual must include a cover page with the deed, along with certain supporting documents. Trial Tr. at 131–32. A representative from the City's Department of Finance with the Division of Land Records (the division "responsible for recording and maintaining real and personal property documents for the four boroughs") identified "red flags," which lead document examiners to question the documents' legitimacy. *Id.* at 130–31, 134, 137. Those red flags include where the sale price listed on a deed is low (i.e., $0 or an amount less than the assessed value) or when the individuals listed on the cover page of the deed (i.e., the buyer, seller, "presenter"[6] and "return to") are the same.[7] *See id.* at 137–38. There were other serious red flags on the deeds for the Trial Properties, including that there were duplicate deeds purporting to transfer the property to Fishbein that listed different social security numbers for the same seller, *id.* at 218–19, 227, 229; Gov. *Fatico* Hearing Ex. ("GX F") 101, GX 103, GX 104, and missing contracts of sale, *see* GX 115; Trial Tr. at 147, 154, 561. All of the deeds and paperwork conveying the Trial Properties bore some or all of those red flags. *See, e.g.*, GX 116, GX 118, GX 121, GX 122, GX F101, GX 103, GX 104.

---

[6] "The presenter is the person that more than likely created the cover page for submission." Trial Tr. at 142.

[7] However, even if a deed has red flags, if the necessary paperwork and signatures are included, the City's examiners must record the deed. Trial Tr. at 138–39. The examiners cannot decide whether a deed is fraudulent. *Id.*

Third, three notaries whose signatures and notary stamps appeared on the deeds "transferring" ownership to Fishbein testified that their signatures, stamps, and handwriting had been forged. Trial Tr. at 441–445, 330–32, 309–16; GX 802, GX 803, GX 804.

Fishbein attempted to rebut that evidence with his own testimony. He asserted that he "got scammed" into believing that he actually purchased the Trial Properties because of the conduct of several individuals not on trial. *See* Trial Tr. at 977. Kaso Rampersad, Kajetan Belza, and Kushu Malik—who Fishbein called the "Characters"—and Erica Yitzhak—Fishbein's former lawyer and occasional real estate broker—would help him identify leads on properties. *Id.* at 762–70, 794. Then, the Characters would take total control over the transaction. They would provide him with the Trial Properties' sale and transfer documents to sign, would be present with him during the closings and direct him on how to proceed, and would record the deeds with the City. *See, e.g., id.* at 762–70, 794, 837, 969. In sum and substance, Fishbein claimed that not once, not twice, but three times—for all three Trial Properties—he attended a closing that he thought was legitimate, but people must have been impersonating the real seller and a notary, and he suggested it was orchestrated by the Characters. *See id.* at 977. However, Fishbein admitted he knew that at least some of the Characters had been arrested for deed fraud in 2014 and convicted for "crimes relating to deed fraud" in 2015. *Id.* at 969–74. Fishbein nonetheless did not question the legitimacy of his title to the properties the Characters helped him "purchase," still held himself out as the owner of those properties from 2014 to 2021, and requested rental subsidy payments for those properties. *Id.* at 970–73.

At trial, Fishbein did not dispute that he rented properties to qualifying tenants and he represented himself to the Agencies as the landlord to receive hundreds of thousands of dollars in payments—step two of the scheme. He knew that "you have to submit a deed" to prove ownership

to the City to participate in the programs. *Id.* at 953. The heart of the dispute at trial was whether Fishbein was the legitimate landlord of the properties. The jury did not credit Fishbein's testimony and concluded that he knew or should have known he did not have title to the Trial Properties.

## III.    The Government's Forfeiture and Restitution Request

In advance of sentencing, on August 11, 2023, the Government asked the Court to preliminarily order payment of $1,894,644.01 in forfeiture and $1,894,644.01 in restitution. Gov't Mot. 1, ECF No. 147. The requested amount corresponds to the wrongfully obtained money from the three schemes: (1) $1,789,116.41 that the Agencies paid Fishbein in rental subsidies from the eighteen properties, (2) $56,002.80 that Agencies paid Fishbein in broker's fees, and (3) $49,524.80 received in Medicaid benefits. Fishbein partially contests the Government's request.

### A.    Portions of the Request Fishbein Consents to Paying

Fishbein agrees to forfeit the amount of rental payments he collected for five of the properties—the three Trial Properties plus two others[8]—and for the broker's fee payments and Medicaid benefits received. Joint Letter 1–2, ECF No. 154. The entire uncontested forfeiture amount equals $886,659.53.[9] Fishbein separately agrees to pay restitution in the amount of the broker's fee payments and Medicaid benefits, which equals $105,527.60.

### B.    Portions of the Request Fishbein Objects to Paying

Fishbein asserts that the Government failed to meet its burden to prove that he must pay forfeiture for the rental subsidy payments he received for thirteen properties ("Disputed

---

[8] The two properties in addition to the Trial Properties are located at 305 Berriman Street ("Property-4") and 509 Rutland Road ("Property-5") in Brooklyn.

[9] Specifically, Fishbein does not contest the $781,131.93 in rental subsidy payments he received from renting out the Trial Properties, Property-4, and Property-5; the $56,002.80 he received as broker's fee payments; and the $49,524.80 pertaining to the Medicaid benefits he received.

Properties")[10] that were not the focus at trial. Fishbein's Resp. 1, ECF No. 150. Fishbein takes the position that he had title to the Disputed Properties when he rented them out through the programs. *Id.* at 1–2. He also argues that paying restitution in the amount of the rental payments for any of the eighteen properties would result in a "windfall" because the Agencies "received value in exchange for their payments to Mr. Fishbein as Mr. Fishbein's properties housed multiple low-income tenants through the programs." *Id.* at 5–6. However, he does not dispute that he in fact received rental subsidy payments for the Disputed Properties in the amount calculated by the Government. *Id.* at 3.

Fishbein requested a hearing to probe the basis for the Government's request regarding the Disputed Properties. Fishbein's Resp. 5. Pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(B), "[i]f the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." The Court therefore granted Fishbein's request for a hearing. Order, ECF No. 151.

IV. **_Fatico_ Hearing**

The hearing was held on November 14, 2023. Two former notaries whose information appears on the deeds of the Disputed Properties testified. The Government also submitted approximately forty exhibits, some of which had previously been admitted during trial. The exhibits consisted of ACRIS documents, authentic signatures of some of the notaries listed on the

---

[10] These properties are located at the following addresses: 121-21 194th Street, Queens; 1511A Commonwealth Avenue, Bronx; 1511B Commonwealth Avenue, Bronx; 24-32 Beach Channel Drive, Queens; 24-36 Beach Channel Drive, Queens; 309 Beach 88th Street, Queens; 82 Utica Avenue, Brooklyn; 54-64 46th Street, Queens; 99-27 Francis Lewis Blvd, Queens; 117-55 140th Street, Queens; 189-32 113th Road, Queens; 2529B Grand Avenue, Bronx; and 480 Quincy Street, Brooklyn.

deeds of the eighteen properties, excerpts of the trial transcript, and sworn affidavits from two other notaries.

Fishbein did not offer any evidence of his own.[11]  He re-raised a prior objection made to the admission of the notaries' affidavits, asserting that they were unreliable and that the Government had to question those witnesses live during the hearing.  Hearing Tr. at 3; Joint Letter 3 n.3.  The Court overruled Fishbein's objection.  There were "sufficient indicia of reliability" to consider the affidavits.  *See United States v. Prescott*, 920 F.2d 139, 145 (2d Cir. 1990); *see also id.* at 143–44 (recognizing that procedures adopted during a *Fatico* hearing "rests in the district court's sound discretion" and may be resolved through "opposing affidavits, letters or other writings, argument and comment directed to the court, cross-examination of witnesses, or a full-blown evidentiary hearing").  At the time Fishbein made this objection, three other notaries testified that their notary information and signatures were forged on deeds conveyed to Fishbein during a similar time period.[12]  The testimony in the affidavits "describe[s] with a high degree of inter-correlation the same kind of behavior" described by other witnesses testifying about deeds the Government asserts were fraudulent.  *See id.* at 145.  Such independent and numerous accounts

---

[11] As rebuttal evidence, Fishbein sought to introduce an investigator's July 2013 interview notes of a meeting he or she had with one of the notaries, or to have the investigator testify.  Hearing Tr. at 75–76.  Fishbein argued that the former notary's recollection of his discussion with the investigator about a property unrelated to the Disputed Properties was "contradicted" by the interview notes.  *Id.* at 75.  The Court denied Fishbein's request.  *Id.* at 80–81.  Fishbein's counsel had the opportunity to fully cross-examine the notary, including presenting him with the investigator's notes to attempt to refresh his recollection.  Additionally, the Court could assess the notary's credibility based on the direct- and cross-examination and give his testimony the appropriate weight without adjourning the hearing to hear from an investigator about an unrelated property.

[12] By the conclusion of the hearing, in total, five notaries testified that their signatures were forged.

demonstrate sufficient reliability. Moreover, the Sixth Amendment's Confrontation Clause protections do not extend to sentencing proceedings, *see United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (collecting cases), so no live testimony was constitutionally required.

## DISCUSSION

"[F]orfeiture and restitution serve different purposes: restitution is for 'remediating a loss,' while forfeiture is for 'disgorging a gain.'" *United States v. McIntosh*, 58 F.4th 606, 611 (2d Cir. 2023) (quoting *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012)). There is "no infirmity" with ordering both forfeiture and restitution as part of a criminal sentence. *United States v. Kalish*, 626 F.3d 165, 169 (2d Cir. 2010). "These remedies are authorized by separate statutes, and their simultaneous imposition offends no constitutional provision." *Id.* Indeed, if the defendant is convicted of certain crimes, both forfeiture and restitution may be mandated by the statutes authorizing each one. *See Torres*, 703 F.3d at 204.

### I.    Forfeiture

#### A. Legal Standard

The Government may seek forfeiture when "a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized." 28 U.S.C. § 2461(c). Payment of forfeiture as part of a criminal sentence serves "important governmental interests such as 'separating a criminal from his ill-gotten gains,' 'returning property, in full, to those wrongfully deprived or defrauded of it,' and 'lessen[ing] the economic power' of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 629–30 (1989)).

If the defendant is convicted of an offense that is punishable by forfeiture, "the court shall order the forfeiture of the property as part of the sentence in the criminal case." § 2461(c).

Fishbein's convictions for mail and wire fraud and for theft of government funds are punishable by the "civil" forfeiture statute. *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), (D), 1961(1); *see also United States v. Schlesinger*, 514 F.3d 277, 278 (2d Cir. 2008). Thus, the Court "must determine what property is subject to forfeiture under the applicable statute," and "the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A).

"Where the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus,' to that scheme, conspiracy, or enterprise." *United States v. Capoccia*, 503 F.3d 103, 117–18 (2d Cir. 2007) (quoting Fed. R. Crim. P. 32.2(b)(1)). The "requisite nexus" for a violation of §§ 1343 (wire fraud), 1341 (mail fraud), and 641 (theft of government funds) "is set forth in 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of'" those crimes. *Id.* at 115 (quoting § 981(a)(1)(C)). "Proceeds" are further defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."[13] § 981(a)(2)(A). Generally, "so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense." *Torres*, 703 F.3d at 199. In addition,

---

[13] The "criminal" forfeiture statute, 18 U.S.C. § 982, permits restitution for Fishbein's conviction for Medicaid fraud under 18 U.S.C. § 1347, a crime statutorily designated as a "Federal health care offense." 18 U.S.C. § 24(a)(1). With a slight variation from the civil forfeiture statute, § 982 requires that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." *Id.* § 982(7). Because Fishbein has agreed to pay forfeiture arising from his Medicaid fraud offense, the Court's analysis is focused on forfeiture punishable pursuant to § 981.

where the conviction includes a scheme charge, "the 'breadth of the conduct forming the basis of the offense of conviction' includes a broader category of criminal conduct encompassed by the overall scheme to defraud." *United States v. Kahale*, No. 09-CR-159 KAM, 2010 WL 3851987, at \*31 (E.D.N.Y. Sept. 27, 2010) (quoting *Capoccia*, 503 F.3d at 117), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

Issues with the "nexus requirement" have typically arisen when the Government seeks forfeiture for property that was not specifically charged in the indictment. In those cases, "[i]n calculating a money judgment for a scheme, as opposed to a discrete violation of a statute, the court may order forfeiture for 'additional executions of the scheme not specifically charged as substantive counts, but which fall within the boundaries of the overall scheme.'" *United States v. Ahmed*, No. 14-CR-277 (DLI), 2017 WL 3149336, at \*15 (E.D.N.Y. July 25, 2017) (quoting *Capoccia*, 503 F.3d at 117); *see, e.g., Kahale*, 2010 WL 3851987, at \*31 (holding that while the indictment specifically referred to "funds obtained from the three investors . . . the funds obtained from the additional investors who testified at trial possess the 'requisite nexus' to the overall scheme 'to defraud B.I.M. investors and lenders'").

The Rules of Evidence do not apply to forfeiture proceedings. *Capoccia*, 503 F.3d at 110 (citing Fed. R. Evid. 1101(d)(3)). So, the Court is "not restricted to information that would be admissible at trial. Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *Martinez*, 413 F.3d at 242. The "court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). The Government has the burden of proof to show "by a preponderance of the evidence that the amount of money or property to be forfeited was derived from proceeds

traceable to the fraud." *Kalish*, 626 F.3d at 168; *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).[14] More specifically, as relevant to the objections raised here, any "additional executions" of the scheme that were not specifically proven during trial must be shown to have a nexus with the defendant's conviction by a preponderance of the evidence. *See, e.g.*, *Ahmed*, 2017 WL 3149336, at *18 (concluding that an expert's analysis of operation room logs to identify the number of surgeries the defendant fraudulently billed to Medicaid was a "proper method" of establishing the forfeiture amount given the "lower burden of proof").

"Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." Fed. R. Crim. P. 32.2(b)(2)(B). "At sentencing—or at any time before sentencing if the defendant consents—the preliminary forfeiture order becomes final as to the defendant." Fed. R. Crim. P. 32.2(b)(4)(A).

### B. Application

The Court concludes that the rental payments Fishbein received for the Disputed Properties are reasonably traceable to the rental payment scheme of which the jury found Fishbein guilty. At bottom, the nexus requirement mandates that the Government "link assets to specific crimes of conviction." *Capoccia*, 503 F.3d at 116. Like the Trial Properties, Fishbein supposedly has title to the Disputed Properties because deeds recorded with the City's Register convey title to him.

---

[14] The mathematical "calculation of forfeiture amounts is not an exact science." *Treacy*, 639 F.3d at 48. Instead, the court "is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Id.* That flexible standard is not at issue here, however, because Fishbein does not dispute the Government's calculation of the amount of rental assistance payments, broker's fee payments, or Medicaid benefits that he received.

However, many of the same hallmarks that proved the Trial Properties were fraudulent are present with the Disputed Properties, which similarly demonstrate that Fishbein knew or should have known that the deeds were fraudulent. His decision to nonetheless hold himself out as the owner of the Disputed Properties to the Agencies so that he could collect rental payments places these additional executions within the same scheme.

First, "additional executions" should occur within the same time period to be considered as part of the same scheme. *See cf. Capoccia*, 503 F.3d at 116 (concluding that "the government has not established (nor logically could it) that the funds involved in the pre-May 2000 transfers were 'obtained . . . as the result' of the later, particular transfers of which Capoccia was convicted"). The Disputed Properties were "conveyed" to Fishbein during the same time period as when the Trial Properties were conveyed. *See* GX 121, GX 104, GX F110, GX F106.

Second, the deeds and transfer paperwork of the Disputed Properties contain the same red flags as the deeds of the Trial Properties. For example, eight of the thirteen Disputed Properties were conveyed for $0 despite the deed paperwork listing the "Total Assessed Value" as significantly larger than zero. *See* GX F114, GX F102, GX F103, GX F108, GX F111, GX F115, GX F104, GX 109. Another property conveyed for more than $0 was still conveyed for significantly less than its value, GX F106, and one deed failed to even identify the property's assessed value, GX 113. Fishbein agrees that he attended the closings and signed these deeds himself, so he must have been aware he purchased them substantially below their value. One of the deeds also lists an obviously fraudulent employer identification number for the "seller" of the property, which was the same fraudulent social security number used for one of the Trial Properties. *See* GX F104, GX 104. And similar to the Trial Properties, none of the transfer paperwork for any of the Disputed Properties contains a contract of sale.

Third, four notaries who purportedly notarized ten of the Disputed Properties testified that their signatures on the deeds were forged and that they did not notarize those documents. Hearing Tr. at 17–18, 20–29, 59–64; GX F201 at 3–5, GX F202 at 5–6; *see also* GX F504 (comparing their forged signatures to examples of their real signatures). One of the notaries, for example, testified that it was not possible that he notarized the deeds because he was not even in the United States on the dates that he supposedly signed the documents or was visiting for such a brief time that he did not work on the Saturday—a day not customarily used for closings—that certain deeds were notarized. Hearing Tr. at 19, 27–28. Although two of the notaries occasionally worked with two of the "Characters," they did not authorize them to use their notary stamps or sign their names on deeds. *Id.* at 29–30, 65. None of the notaries knew Fishbein or his company 2166 Dean LLC or notarized documents for Fishbein. Hearing Tr. at 15, 55–56, 65–66; GX F201 at 2, GX F202 at 1.

Finally, either Yitzhak or Belza, two of the individuals Fishbein argued at trial were to blame for the rental subsidy scheme, have some connection to almost every one of the Disputed Properties. Yitzhak is listed as the "presenter" on the ACRIS cover page for three of the Disputed Properties, GX F107, GX F105, GX F110, and three of the properties for which Fishbein consents to paying forfeiture, GX 122, GX 111, GX 114. But Yitzhak testified at trial that her name was inaccurately listed as the "presenter" for all six properties. For each of those properties, Yitzhak confirmed, by running a search for the unique document IDs generated by each ACRIS cover page, that she could not have been the presenter: no transactions were found in her ACRIS account for those document IDs. *Id.* at 467–68, 532–33, 479–80. Although Yitzhak prepared some documents for Fishbein related to these properties, she relied exclusively on the information he provided without doing independent investigation, did not advise him on these transactions, and did not attend the closings for these properties, which she would have done had she represented him. *Id.*

at 477–79; GX F501. Fishbein claimed, however, that Yitzhak helped him "[a]ll the time"— "doing the due diligence and advice." Trial Tr. at 1030. That was not the first time Yitzhak believed that she was wrongly accused of advising Fishbein or filing documents for him. On October 15, 2019, she submitted a sworn affidavit to "correct the numerous inaccuracies and falsehoods stated by Mr. Fishbein on the record, and under oath, at" a deposition given in a civil case about one of the Disputed Properties. GX F801. Fishbein stated during the deposition that Yitzhak was the presenter of the ACRIS documents and that after he provided her with "everything" related to the deal, she advised him to move forward with the transaction, including assuring him of the "legality and legitimacy" of purchasing the property for $10,000 even though it previously sold for $625,000. *Id.* Yitzhak responded that Fishbein's assertions were "false," "pure fabrication" and "inaccurate[]." *Id.*

Belza's substantial involvement with these properties should have alerted Fishbein that he lacked legitimate title. Belza, who was listed as the presenter for one of the Trial Properties, GX F101, is likewise listed as the "presenter" for nine of the Disputed Properties, GX F114, GX F102, GX F103, GX F106, GX F108, GX F111, GX F115, GX F104, GX F109. As described during trial, Belza and Fishbein worked together many times. Trial Tr. at 744–45, 837. Not only did Belza and the other "Characters" prepare the transfer paperwork and host closings for some of the properties, but "[t]hey were responsible to record [the deeds]." *Id.* at 837, 972–73. Although Fishbein claimed that he stopped doing business with the Characters when he learned they were arrested for deed fraud in 2014, *id.* at 838, he continued to hold himself out as the owner of the properties they worked with him on because the deeds were "already recorded on the county," *id.* at 971–72. Notably, it was Fishbein's request to the Agencies for rental subsidies post-2014— after Belza's arrest for "crimes relating to deed fraud"—that was the basis for the jury's verdict in

this case. *See id.* at 970; GX F502. Fishbein himself pleaded guilty to possession of a forged deed in December 2017, GX F602, Trial Tr. at 883, which certainly gave him the tools and awareness to revisit and analyze other deeds in his name before continuing to submit them to the Agencies.

Fishbein argues that, as supported by his and Yitzhak's trial testimony, he purchased the Disputed Properties in good faith. *See* Fishbein's Resp. 3. He was a real estate investor of "stressed" properties that are purchased for little to no consideration because they are subject to the liens on the property or a "short sale," so the Properties' low purchase price is not a red flag. Trial Tr. at 583, 742, 749. He adds that even if the Characters orchestrated straw closings, he was not aware of that, especially in light of Yitzhak's advising on the transactions and the presence of a notary and seller at the closings. *See id.* at 750, 765, 784. Several points cut against his arguments. First, both at trial and during another litigation, Yitzhak rejected that she advised Fishbein. Second, if Fishbein obtained any of the Disputed Properties as "short sales," there would have been an agreement with the bank reflecting that Fishbein assumed the outstanding mortgage for an amount lesser than the original mortgage. Trial Tr. at 459. But no such agreements exist, nor do any agreements with the sellers reflecting Fishbein's assumption of their liens in full. *See, e.g., id.* at 755–56, 799, 897, 904–05, 916–17. Finally, it would have been highly improbable that Yitzhak or the Characters could have "scammed" Fishbein so many times and using the same method without him becoming suspicious. For example, two notaries supposedly notarized deeds for nine properties. *See* GX F101, GX F102, GX F103, GX F108, GX F111, GX F114, GX F115, GX F104, GX F113. The Characters would have had to hire the same impersonator to notarize those documents at each closing. Indeed, for one of the Disputed Properties, Fishbein testified that he could tell there was an "issue" when the seller did not attend the closing, Trial Tr. at 794, but

he apparently moved forward with the transaction and then submitted that deed to the Agencies for rental subsidies.

Fishbein's rebuttal does not overcome the Government's evidence, which demonstrates that Fishbein fraudulently obtained title to the Disputed Properties. At a minimum, the characteristics of the Disputed Properties and the circumstances under which they were conveyed show that Fishbein was aware to a high degree of probability that he did not actually have title yet consciously avoided confirming that fact. Separate from the characteristics that should have led Fishbein to question his ownership, Fishbein also failed to list the Disputed Properties or the money he collected from renting them on his tax returns[15] and Medicaid paperwork, which suggest that he attempted to hide his connection to avoid detection. *See* Trial Tr. at 979–88; GX 1705, GX 1408, GX 1203.

Like at trial, Fishbein does not dispute that he completed the second part of the scheme. He held himself out as the owner of the Disputed Properties to the Agencies to collect rental payments, and indeed received hundreds of thousands of dollars. With both the trial evidence and the additional evidence submitted during the *Fatico* hearing, the Government has demonstrated that the rental payments Fishbein received for the Disputed Properties constitute proceeds traceable to the rental subsidy scheme proven at trial. "Congress intended to authorize disgorgement of gain, wherever gain fairly traceable to a wrong may be found." *Torres*, 703 F.3d

---

[15] Fishbein reported the rental income received for one of the Disputed Properties on his 2020 and 2021 tax returns. GX F901 at 285, 347. Even considering that evidence, however, Ramlogan's testimony that he was in another country when the deed was supposedly notarized by him, Hearing Tr. at 24, the facial flaws with the deed itself, and Belza serving as a presenter, GX F108, independently support that Fishbein would have been aware to a high degree of probability that he was not the rightful owner.

at 199.   Therefore, the full amount of payments he collected for the Disputed Properties ($1,007,984.48) is subject to forfeiture.[16]

## II.   Restitution

The Government moves for restitution in the same amount and kind as forfeiture.  It seeks restitution of $1,894,644.01 for: (1) $1,789,116.41 in rental payments to be repaid to the HRA and HPD; (2) $56,002.80 in broker's fee payments to be repaid to the HRA; and (3) $49,524.80 in Medicaid benefits to be repaid to Medicaid.  Fishbein agrees to pay forfeiture to the HRA and Medicaid in the amount of the broker's fee payments and Medicaid benefits but argues that restitution is not warranted to the HRA and HPD for the amount of the rental payments for *any* of the rental properties.  Fishbein contends that the HRA and HPD "received value in exchange for their payments" because Fishbein "housed multiple low-income tenants through the programs," so his obligation to pay restitution should be at least offset by the value the Agencies received. Fishbein's Resp. 5.

### A.  Legal Standard

Pursuant to the Mandatory Victims Restitution Act ("MVRA"), the "court shall order" a defendant convicted of "an offense against property under" title 18, "including any offense committed by fraud or deceit," to pay restitution to "an identifiable victim or victims" who "has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(a)(1), (c)(1).  "The 'primary and overarching

---

[16] Although not disputed, the trial evidence also supports that the Government has met its burden to demonstrate forfeiture for the broker's fee payments and Medicaid benefits. First, the Government proved that the broker's fee requests were submitted to the Agencies, each listing "LDG Realty, Inc.," Yitzhak's broker firm, as the broker.  GX 1405, 1406; Trial Tr. at 505.  But Yitzhak did not serve as a broker, did not give Fishbein permission to list LDG Realty as the broker, and did not receive any broker's fees for renting out any of those properties.   Trial Tr. at 505–06.  Second, Fishbein totaled $49,524.80 in Medicaid claims, but would not have qualified for Medicaid had he accurately reported his income. *See id.* at 367–69; GX 1203, GX 1408.

goal of the MVRA is to make victims of crime whole': to 'compensate these victims for their losses and to restore the[m] to their original state of well-being.'" *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (quoting *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011)). A "victim" for purposes of the statute is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

The Government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e). "The purpose of restitution is to compensate victims for their losses," and so restitution must be ordered "in the full amount of, but not in excess of, his, her, or its loss." *United States v. Gonzalez*, 647 F.3d 41, 65, 67 (2d Cir. 2011).

B. Application

Fishbein's convictions for mail and wire fraud arising from the rental payment scheme fall within the statute's requirement that restitution be ordered for an offense against property, including one perpetrated using a scheme. The facts and circumstances of those crimes (both violations of title 18) and the way in which they were executed (i.e., a scheme) are swept into the statute's mandate. *See, e.g., United States v. Kinney*, 610 F. App'x 49, 52 (2d Cir. 2015) (concluding that the MVRA "required the district court to order restitution for all losses caused by [the defendant's] criminal conduct pursuant to [the] scheme" that was the basis for her wire fraud conviction); *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020) ("courts may consider the facts and circumstances of the crime that was committed to determine if it is an 'offense against property' within the meaning of the MVRA"). Fishbein must pay restitution to the HRA and HPD in the amount of the rental payments to cover the loss for the entire scheme: $1,789,116.41.

Fishbein argues that the Second Circuit requires the Court to offset that amount with the "value" the HRA and HPD received for renting the properties to tenants eligible to participate in the program. This Court rejected Fishbein's attempt to assert a similar argument—that those agencies received the "benefit of the bargain" because Fishbein actually rented the apartments to qualifying participants—as a defense during trial. *Fishbein*, 2023 WL 5035179, at *8. The Court concluded that defense was unavailable because only the owner of the property could contract with the Agencies, regardless of the adequacy of the services provided. *Id.* Similarly, Fishbein now asserts that *United States v. Gonzalez*, 647 F.3d 41 (2d Cir. 2011) mandates that the Court reduce the restitution amount by the amount of "benefit" the Agencies received. In *Gonzalez*, the defendant pleaded guilty to mail and wire fraud offenses for using "sham" charitable organizations "established specifically for the purpose of channeling donor and grant funds to Gonzalez for his personal use." *Id.* at 64. The court ordered restitution of $122,775 to the contributors of one of the charitable organizations, premising its order on the basis that each donor "expected 100 percent of his contribution to be used for charitable purposes." *Id.* at 64, 67. The Second Circuit concluded that the court did not accurately quantify the donors' losses. The district court failed to reduce the restitution by the value the victims contributed to attend a gala and receive particular things, such as food and drink, at the event, and indeed received those things. *Id.* at 66.

*Gonzalez* does not stand for the proposition that offsetting the restitution amount is always required for victims who receive something from the defendant. Here, Fishbein's scheme diverted the City's limited funds set aside for the rental assistance programs away from landlords legitimately entitled to participate. That diversion results in a full loss of funds regardless of whether the HRA and HPD would have been in essentially the same position had those funds been directed to landlords not renting properties under false pretenses. *See, e.g., United States v.*

22

*Hiralall*, 444 F. App'x 506, 507 (2d Cir. 2011) (rejecting the argument that the federal government was not entitled to forfeiture to cover the amount the defendant wrongfully received in food stamps benefits because the loss is that "federal program benefits are diverted from their intended use," and collecting cases relying on the same rationale).

Further, Fishbein's receipt of the rental payments stemmed initially from fraud—he obtained a sham "interest" in properties and falsely represented himself as the owner of those properties to the HRA and HPD. The Second Circuit has suggested that precisely that type of conduct would not require a reduction to account for a portion of "honestly provided" services because the fraud infects the entire interaction. In *United States v. Bahel*, the Second Circuit affirmed the district court's calculation of restitution of a portion of an employee's salary; the district court included a loss reduction for the amount of honestly provided employment services because the defendant "only . . . engaged in a significant pattern of honest services fraud, *not that he obtained his position through fraud in the first instance*." 662 F.3d 610, 649 (2d Cir. 2011) (emphasis added). In reaching that conclusion, the Second Circuit distinguished it from a case in the Fifth Circuit where the defendant paid restitution "in the amount of the salary and pension awarded to the employee in the year after his fraud." *Id.* (discussing *United States v. Crawley*, 533 F.3d 349, 359 (5th Cir. 2008)). Although the "same principle" applied and supported restitution, the "one distinguishing factor between the cases" resulting in a different loss calculation was that the defendant in the Fifth Circuit's decision in *Crawley* obtained his position as a union president, and therefore his full salary and pension, "*through fraud*." *Id.* (emphasis added).

Fishbein's scheme certainly falls closer to the defendant's fraud in *Crawley*, requiring restitution of the full loss amount resulting from the fraud. Besides, the gala contributors in *Gonzalez* and the individuals who received "honestly provided" services in *Bahel* are more like

the tenants who rented the apartments from Fishbein—not the Agencies.  Those individuals received a service from Fishbein that may have required offsetting the restitution amount.  But the Government has not sought to recover the amount that Fishbein received in rent from tenants directly, so no offset is warranted.

## CONCLUSION

For the foregoing reasons, the Government's motion for forfeiture and restitution in the amount of $1,894,644.01 each is **GRANTED**.  This Opinion & Order constitutes the Preliminary Order of forfeiture and restitution and will become final at sentencing.  *See* Fed. R. Crim. P. 32(b)(2), (b)(4).  The Court will issue separately a final order of forfeiture and restitution.  The Clerk of the Court is directed to close ECF No. 147.

Dated: New York, New York
       November _1_, 2023

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge